# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00390-CR

**Robert Sanchez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT NO. D-1-DC-05-900262, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following a bench trial, appellant Robert Sanchez was adjudged guilty of theft $500 or more by a public servant, a state jail felony. *See* Tex. Penal Code Ann. § 31.03(a), (e)(3), (f)(1) (West Supp. 2009). The court assessed a misdemeanor punishment of thirty days in county jail, suspended imposition of sentence, and placed appellant on community supervision for one year. *See id*. § 12.44(a) (West Supp. 2009). Appellant contends that the evidence is legally and factually insufficient to support the finding of guilt and that the court erred by admitting certain documents in evidence. We overrule these contentions and affirm the judgment.

Appellant was a lieutenant in the Austin Community College (ACC) police department. In 2002, Lieutenant William McCauley and Sergeant Jesus Brantner were assigned to investigate reports that certain members of the department were "double-dipping," that is, being paid by the college for time they were actually devoting to off-duty employment. Based on the findings

of McCauley and Brantner, appellant, Sergeant Albert Olguin, and Officer Lewis Reese were terminated by the department in 2003. The terminated officers appealed their dismissals to a college grievance committee which, following a hearing, reinstated them with back pay. McCauley and Brantner then reported their findings to the district attorney. In 2005, indictments were filed accusing Olguin, Reese, and appellant of stealing $1500 or more from the college pursuant to a scheme and continuing course of conduct that began on or about May 8, 2001, and continued until on or about September 30, 2003. *See id*. § 31.09 (West 2003). Following a joint trial, the district court adjudged Olguin and Reese to be not guilty and convicted appellant of the lesser included offense.

As a lieutenant, appellant was a salaried employee.[1] Because he was on salary, appellant was not required to report the specific hours that he worked, but he was nevertheless expected to work forty hours per week. The chief of the ACC police at that time, Paul Williams, testified that appellant had the flexibility to choose the hours he worked, so long as he fulfilled his obligation to work (or report paid leave) for forty hours each week.[2] If appellant worked more than forty hours in a week, he received comp time rather than overtime pay. Appellant accrued paid vacation and sick leave, and he was required to file a leave of absence form each month showing the hours, if any, that he had taken that month as paid leave.

---

[1] Although appellant was paid a salary, the evidence regarding the amount of his compensation was in terms of an hourly rate. In 2001, appellant was paid $18.13 an hour. In 2002, he was paid $19.14 an hour. In January through August 2003, appellant was paid $19.60 an hour, and he was paid $21.08 an hour for the rest of that year.

[2] On the other hand, Brantner testified that appellant and his co-defendants worked the "A shift," which was 6:30 a.m. to 2:30 p.m. weekdays. According to Brantner, the three co-defendants were assigned to the Riverside campus, where appellant supervised Olguin, and Olguin supervised Reese.

The case against appellant rested largely on documentary evidence.  This evidence included duty logs, district dispatcher's logs, and daily activity logs from May 2001 through September 2002.  A duty log is a record, kept by the department's dispatchers, showing when each officer reports (either by radio or telephone) on and off duty each day.  A district dispatcher's log is a daily record, also kept by the dispatchers, of calls received and made by the dispatchers and reflects police activities college-wide.  A daily activity log is kept for each individual campus of the college and is a record of police activities on the campus.  The entries in a daily activity log are made by the officers and sergeants assigned to the campus.  In addition to these logs, the State also introduced copies of the leave of absence forms filed by appellant during the relevant time period and copies of appellant's employment records from several other employers.   Using these documents, Mary Khin, an investigator in the district attorney's office, calculated the number of hours appellant was shown to have worked at the college, the number of hours of paid leave reported by appellant, and the number of hours appellant was shown to have worked for other employers from May 2001 through September 2002.  A calendar prepared by Khin summarizing the records and showing appellant's employment for each month was also introduced in evidence.  *See* Tex. R. Evid. 1006.

Khin testified that she was able to verify that appellant had worked at the college or taken paid leave of absence for a total of 1011.5 hours from May 2001 through July 2002, an average of 67.5 hours per month.[3]  Khin testified that based on the assumption that appellant was obligated to work 160 hours at the college each month (40 hours per week times 4 weeks), she was unable to account for a total of 1388.5 hours, an average of 92.5 hours per month, during those months.  To

---

[3] Appellant took paid leave for the entire months of August and September 2002.

give some perspective to these numbers, at appellant's 2001 salary of $18.13 an hour, it would require payment for only 28 hours of work not performed to constitute the $500 misappropriation found by the trial court. Appellant's documented work and paid leave hours at the college during any single month of the period ranged from a low of 24 hours in April 2002 to a high of 113 hours in May 2001. During those same 15 months, appellant was shown to have worked a total of 715.5 hours of off-duty employment at three different employers, an average of almost 48 hours per month. In May 2002, a month in which Khin could account for only 32 hours of college employment, records showed that appellant worked a total of 126.5 hours at three off-duty jobs.[4]

Imad Mouchayleh is the internal auditor at ACC, and he chaired the committee that heard appellant's appeal from his dismissal. He testified that during the hearing, appellant said, "Yes, I did it. It was a big mistake." Mouchayleh could not remember the exact question to which this answer was given, but he testified that "the whole committee was for—to look at the allegation of double-dipping, so it has to be related to that." Another member of this committee, patrol officer Mickey Priddy, testified, "As best I can remember, Mr. Sanchez was asked a question . . . along the lines of . . . did you do what you're being accused of . . . . And to the best of my memory, he admitted that he had done wrong, he was sorry for what he had done and he knew that what he had done was wrong." Maxine Kaplan, a contract compliance manager for the college, testified that she "happened to run into" appellant on the day he was terminated. She said that she could see that appellant was upset, and she asked him what was wrong. She testified, "He told me that he had been

---

[4] Payroll records from Omni Bank, one of appellant's off-duty employers, showed that appellant's hours at the bank regularly overlapped the 6:30 a.m. to 2:30 p.m. weekday time period that, according to Brantner, appellant was assigned to work at ACC's Riverside campus.

terminated. . . . That the reason . . . had to do with working another job during work time." Kaplan recalled that appellant told her that Williams, the chief of police, had given him permission to do that.

Appellant does not contend that the evidence summarized above does not rationally support a finding beyond a reasonable doubt that appellant appropriated $500 or more from ACC by accepting salary for hours he did not work at the college. Instead, appellant argues that this appropriation was not unlawful because it was done with the college's effective consent.

Appellant notes that his leave forms were approved by Williams, his supervisor, and that without that approval appellant would not have been paid. Williams testified that he trusted appellant, and that he routinely approved appellant's leave forms without independently verifying their accuracy. Williams was not asked and did not testify whether he gave appellant permission to work other jobs on college time, as appellant told Kaplan. Williams did testify, however, that he did not give appellant permission to work from home for six months, from September 2001 to April 2002. Williams also testified that he expected appellant and the other lieutenants he supervised to work a full 40 hours each week.

Appellant also refers to the testimony of Geraldine Tucker, ACC's associate vice-president for human relations. Tucker testified that an employee's supervisor is a representative of the college and the employee's pay is based on what the supervisor authorizes. She also testified, however, that both the supervisor and the employee were required to comply with the college's policies. Tucker testified that no one at the college was authorized to approve payment for work not performed or to permit an employee to work for another employer on college time.

5

Appellant relies chiefly on the results of his appeal from the termination. He argues that the grievance committee "specifically looked into the allegations that [appellant] was paid for hours not worked as a basis to uphold the termination and they did not uphold the termination." He urges that the committee, "by failing to uphold [appellant's] termination, and instead letting him keep the pay that had been paid to him and reinstating him to his former position, effectively consented to [appellant] keeping the monies paid to him from May 2001 through September 2003." Appellant notes that according to Tucker, the committee that heard appellant's appeal was a "duly authorized representative" of the college, and that, according to Mouchayleh, the college president could have overruled the committee's recommendation that appellant be reinstated but did not do so.

Mouchayleh denied that the committee approved the challenged payments to appellant. He indicated, in response to questions by the State, that the committee "was not there to investigate whether [appellant] was guilty or not." Instead, the committee "was there to . . . determine whether or not the termination process had been fair." During cross-examination by appellant's counsel, Mouchayleh explained the decision to reinstate appellant as follows: "The termination was for the double-dipping. The admission—he admitted that he did it, but—because the termination was made on an unfair process because others were double-dipping and they were not terminated." Mouchayleh added, "The committee decision was only to whether the termination was to be upheld or not. It has nothing to do with his pay or anything else."

Tucker's testimony was similar. She testified, "My recollection is that the grievance committee said—their report to me was that the basis for the documentation of the time was not

6

official and, therefore, we should allow the employees to come back to work and give them back pay." Tucker also testified:

> The grievance committee did not make any findings as to [appellant's guilt or innocence]. They simply decided—see, the decision has to be based on whether or not the termination was valid itself. And so the decision was that the basis upon which would make the determination, which were these supposedly records, were not official, therefore, we should not have terminated the employees but there was no guilt or innocence. It's whether the termination should be upheld.

Tucker agreed with the prosecutor that "the grievance committee [did not say] they didn't do anything wrong."

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a legal sufficiency review, all the evidence is reviewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 234 S.W.3d at 778. In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson*,

7

23 S.W.3d 1, 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Viewing the evidence in the light most favorable to the finding of guilt, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant did not have ACC's effective consent to receive salary payments for work not performed. There is evidence that appellant's supervisor, Williams, was not authorized by the college to approve salary payments for work not performed, and Williams denied knowingly doing so. The court could rationally conclude that the grievance committee's decision to reinstate appellant with pay did not constitute ACC's retroactive consent to appellant's appropriation of unearned salary, but merely reflected the committee's conclusion that the termination process had been flawed or unfair. Point of error one is overruled.

There was testimony suggesting that Williams knew that appellant was not working full-time for the college and was accepting pay from the college for time spent working elsewhere. There was no evidence, however, that Williams was authorized by the college to permit appellant to do this. To the contrary, ACC's vice-president for human relations testified without contradiction that no supervisor was authorized to approve full-time pay for part-time work. There is no evidence that the grievance committee's decision to reinstate appellant was based on a finding that appellant was not guilty of the accusation against him or constituted the college's consent to appellant's

actions. Even when the evidence is viewed in a neutral light, the trial court's finding beyond a reasonable doubt that appellant did not have ACC's effective consent to receive pay for work not performed was neither clearly wrong or manifestly unjust nor against the great weight and preponderance of the available evidence. Point of error two is overruled.

Appellant's last point of error is that the trial court erred by admitting in evidence State's exhibits 1 through 68— the duty logs, dispatcher's logs, and daily activity logs—because they were unreliable. By extension, appellant also contends that State's exhibit 87, the calendar summarizing his activities as reflected in these logs, should not have been admitted.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). A court's decision to admit evidence under an exception to the hearsay rule will be upheld unless it was so clearly wrong as to lie outside the zone of reasonable disagreement. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

Exhibits 1 through 68 were admitted under the hearsay exception for records of regularly conducted activity. Tex. R. Evid. 803(6). Under this exception, a business record is admissible if: (1) it was made and kept in the course of a regularly conducted business activity; (2) it was the regular practice of the business activity to make the record; (3) the record was made at or near the time of the event that it records; and (4) the record was made by, or from information transmitted by, a person with knowledge. *Id.* Even if these requisites are met, and it is undisputed that they were in this case, a record is inadmissible under rule 803(6) if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. *Id.* Appellant's

9

argument rests on this proviso. He contends that the various logs were shown to be an unreliable record of when a campus police officer was working.

Appellant cites Tucker's testimony that the grievance committee did not consider the logs to be a valid basis for terminating his and his co-defendants' employment because they were not "official." Appellant also points to an exchange between Mouchayleh and the trial court, in which the court asked Mouchayleh, as internal auditor at the college, if he considered the logs to be "reliable to determine when somebody works." Mouchayleh answered that he did not consider the logs to be reliable for that purpose. Appellant's co-defendant Olguin testified that the duty and dispatch logs were inaccurate due to the dispatchers' inexperience and lack of training, and that the daily activity logs were not intended to record when duty shifts begin and end but only to record significant events during the day. Williams also acknowledged, in response to questions by defense counsel, that there were "discrepancies" in the duty logs. Another ACC police officer, Lieutenant Michael McCradic, agreed with appellant's counsel that the logs maintained by the dispatchers were "not always 100 percent accurate," but added that "we have the activity log on campus that we [the officers] filled out."

Appellant refers us to two opinions, both dealing with the admissibility of documents found in files maintained by parole officers. In one, the defendant's parole file contained a urinalysis report showing that he had tested positive for amphetamines. *Philpot v. State*, 897 S.W.2d 848, 850 (Tex. App.—Dallas 1995, pet. ref'd). The court held that the report was not a trustworthy business record because there was no evidence regarding the qualifications of the anonymous tester or the methodology employed. *Id.* at 851-52. The other opinion cited by appellant dealt with the admission

10

of documents and letters concerning the defendant's psychological condition and amenability to rehabilitation that were found in his parole file. *Porter v. State*, 578 S.W.2d 742, 744-45 (Tex. Crim. App. 1979). After noting that the sources of the opinions contained in these documents were for the most part anonymous and that none were shown to be competent to make the statements attributed to them, the court held that the documents did not have an indicia of reliability commensurate with the rights of confrontation and cross-examination merely because they were collected in a government file. *Id*. at 746. Dealing as they do with the issue of hearsay within hearsay, neither of these opinions is on point with the cause before us.

A commentator on the rules of evidence has written:

> The background of the "lack of trustworthiness" proviso is described extensively in the Advisory Committee's Note to Federal Rule 803(6). Courts are likely to invoke the "lack of trustworthiness" proviso with regard to documents prepared in anticipation of litigation, or under circumstances similarly suggesting a motive to misrepresent. Among the Texas cases that have applied the proviso, one court found that income tax returns possess sufficient trustworthiness. In another, the court excluded a post-mortem blood test offered to support an affirmative defense of intoxication in a workers' compensation case, finding gaps in the chain of custody, and that certain recitations in the Rule 902(10) affidavit accompanying the record were "impossible."
>
> A party need not prove that business records are accurate before they are admitted. Generally, objections that records contain inaccuracies, ambiguities, or omissions go to weight rather than admissibility.

2 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 803.11 (3d ed. 2002) (footnotes collecting federal and state cases omitted).

When exhibits 1 through 68 were first offered by the State, appellant objected on confrontation grounds, but not on the lack of trustworthiness ground he now urges. Later in the trial,

appellant moved to strike the exhibits "based on the evidence that this [trial] Court has heard from people who actually know these documents, including an internal auditor from the college, they are unreliable." The court overruled the motion to strike, ruling that "the arguments that you have made and the testimony that I've heard goes to the weight and not the admissibility of those documents."[5]

There is no evidence that the duty logs, dispatcher's logs, and daily activity logs were prepared under circumstances suggesting a motive to misrepresent. This is particularly true with regard to the daily activity logs, which were prepared by the officers themselves. On the other hand, it is reasonably clear that these various logs were not maintained for payroll purposes, and there appears to be no serious dispute that they contained omissions and inaccuracies with respect to the actual number of hours a particular campus police officer might have been on duty on any particular day. Nevertheless, it was not unreasonable for the trial court to conclude that the logs were a broadly accurate reflection of appellant's activities as a campus police officer during the months in question. We find no clear abuse of discretion in the court's decision to admit exhibits 1 through 68 and to consider the testimony regarding the omissions and inaccuracies in the logs as going to the weight of the evidence.[6] Because appellant's challenge to the admission of exhibit 87 is premised on the inadmissibility of exhibits 1 through 68, we also find no abuse of discretion in the admission of that exhibit. Point of error three is overruled.

---

[5] The State does not contend that appellant's objection to the challenged evidence was untimely.

[6] It appears that the trial court did significantly discount the weight of this evidence, given its decision to convict appellant of the unlawful appropriation of $500, rather than the $1500 alleged in the indictment, and to acquit appellant's co-defendants.

12

The judgment of conviction is affirmed.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   December 29, 2009

Do Not Publish